South Porto Rico Sugar Company, demandante y apelante, *v.* Juan G. Gallardo, sustituído por Manuel V. Domenech, como Tesorero de Puerto Rico, demandado y apelado.

No. 5589.—*Sometido:* Diciembre 6, 1932. *Resuelto:* Diciembre 20, 1933.

*Frazer & Castro Fernández,* abogados de la apelante; *Hon. Procu-*
*rador General Charles E. Winter y M. Rodríguez Serra, Procu-*
*rador General Auxiliar,* abogados del apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO, emitió la opinión del
tribunal.

La demandante, una corporación organizada bajo las leyes
de Puerto Rico, inició este pleito reclamando la devolución de
$18,443.59 por concepto de contribuciones pagadas bajo pro-
testa.

Contestó el demandado aceptando algunos hechos y ne-
gando otros. En resumen sostuvo la tasación.

En febrero 5, 1929, ambas partes estipularon que se nom-
brara árbitro a Rafael Carrión Pacheco para dictaminar so-
bre el verdadero valor en enero 15, 1925, de diez y seis de
las diez y ocho propiedades a que se refiere la demanda, sobre
si existían o no las casas Nos. 25 y 59 que fueron tasadas en
$3,400, sobre si los once kilómetros de vía tasados en el Mu-
nicipio de Añasco fueron incluídos como parte de 33.5 kilóme-
tros que ya habían sido tasados y sobre si el equipo de radio
tasado separadamente estaba incluído en la tasación de telé-
fono y telégrafos. La estipulación fué aprobada por la corte
y el árbitro rindió su informe en abril 8, 1929. Fijó el valor
de cada uno de los bienes especificados y concluyó que las

casas Nos. 25 y 59 no existían, que el equipo de radio no fué incluído en la tasación de teléfono y telégrafos y que los once kilómetros de vía de Añasco formaban parte de los 33.5 tasados separadamente.

El dictamen del árbitro fué aprobado finalmente por la corte en junio 21, 1930, y celebrada la vista, la corte decidió el pleito aceptando la valoración que dió a las propiedades el árbitro, excluyendo de la tasación la casa No. 59 valorada en $600 por no existir; los once kilómetros de vía en Añasco tasados en $15,400 por estar englobados en otros también tasados, y el laboratorio, la bomba y los tanques de aceite tasados en $10,000, $10,000 y $41,000, respectivamente, por entender que formaban parte integrante de la fábrica, y en su consecuencia ordenó al Tesorero que devolviera a la demandante $4,405.51 con intereses al 6 por ciento anual a partir de febrero 20, 1926. No conforme la demandante, interpuso el presente recurso de apelación que versa sobre las dos únicas cuestiones de importancia que la corte resolvió en contra suya, a saber: que las oficinas, los almacenes para azúcar y los demás almacenes valorados por el árbitro, respectivamente, en $3,000, $100,000, $58,525, y las piezas de maquinaria de repuesto tasadas en $175,000, no formaban parte integrante de la fábrica dentro del sistema seguido para la tasación, y que la tasación de la fábrica de azúcar aplicando el 115 por ciento del tipo *standard* usado por el Tesorero era ilegal.

¿Cuál fué el llamado sistema del Tesorero, seguido en este caso? Lo explica uno de los testigos que declaró en el juicio, Juan Martínez Chapel, tasador de corporaciones del Departamento de Hacienda de Puerto Rico, como sigue: Obtenida la capacidad diaria en toneladas de los molinos de la central se multiplica el número de toneladas por $550 y el resultado es la tasación. Fué un acuerdo de la Junta de Revisión e Igualamiento a los efectos de adoptar un valor uniforme después de investigaciones y audiencias de los mismos centralistas.

■■ La parte apelante no impugna el sistema. Expresamente manifiesta que está conforme con él. Pero sostiene que aplicado a su caso resultaría que siendo el promedio diario de su fábrica 4,103 toneladas, multiplicado ese promedio por $550 se obtendría la suma de $2,256,650 que constituiría la justa tasación, y no la de $2,595,140, que implica una diferencia en su contra de $338,490 y a la que se llegó aumentándole un 15 por ciento a los $550 por los cuales debía multiplicarse el número de toneladas diarias molidas por la fábrica para hallar el valor de ésta.

Refiriéndose al aumento declaró Martínez Chapel, que al principio la Junta de Revisión e Igualamiento fijó para multiplicar por el número de toneladas diarias la suma de $605 y que cuando la bajó a $550 a virtud de la intervención de los centralistas "se puso como condición que de acuerdo con las horas que moliera cada central se aplicaría un tanto por ciento de la tarifa que variaba desde 60 por ciento a 115 por ciento de acuerdo con el número de horas que había molido la central."

Dijo que la Guánica en 1924–25 se tasó en un 110 por ciento y en 1925–26 en un 115 por ciento. Que no recuerda si llegó a tasarse alguna Central a razón del 60 per ciento. Que hubo otras centrales tasadas a más de 100 por ciento, no recordando si alguna, además de la Guánica, lo fué a razón del 115 por ciento.

De un análisis de la declaración del testigo puede deducirse que la junta estimó que para fijar el justo valor de cada central debía tomarse en consideración además del número de toneladas que podía moler, la rapidez con que lo hiciera, fijando en 100 el *standard* de rapidez, por entender seguramente que dicho nuevo factor si bien introducía una aparente desigualdad entre las centrales de la Isla, de hecho tendía a consagrar el principio de igualdad por ser en realidad más valiosa la fábrica que molía con mayor rapidez.

Antes de exponer nuestro criterio definitivo sobre este extremo, procederemos al estudio de la otra cuestión envuelta

en el asunto, a saber: si las oficinas, los almacenes para azúcar, los otros almacenes y las piezas de repuesto forman o no parte integrante de la fábrica a los efectos de la fijación de los $550 por los que debe multiplicarse el número de toneladas para determinar su valor, ya que, a nuestro juicio, ambas cuestiones están tan íntimamente relacionadas que para llegar a una justa resolución del problema deben considerarse a la vez.

La teoría de la demandante y apelante es que estando directamente relacionados las oficinas, los almacenes y las piezas de repuesto con la fábrica de azúcar, deben considerarse parte integrante de la misma. La del demandado, que para fijar los $550 por los que debía multiplicarse el número de toneladas sólo se tomaba en consideración "el valor de las maquinarias y el edificio donde están establecidas."

Con referencia a los almacenes para azúcar se le preguntó por el abogado de la parte demandante al testigo Martínez Chapel, como sigue:

"A.—Pero cualquier fábrica o manufactura de azúcar tiene que tener un sitio para ponerla antes de embarcarla?—T.—Sí, señor, pero todas las fábricas tienen almacenes separadamente de donde fabrican.—A.—Entonces se tasan separadamente?—T.—Sí, señor.—A.— En adición a la fábrica?—T.—Sí, señor."

Y cuando refiriéndose al caso de que pudiera el sitio de almacenaje formar parte del edificio mismo de la fábrica, se le dijo: "A.—Pero usted está de acuerdo conmigo que si nosotros trasladamos nuestra oficina, nuestro laboratorio químico y nuestra bomba de agua salada a la misma fábrica no tendríamos que pagar esa contribución?" Contestó: "T.— Si la Central Guánica o cualquier central lo hiciera habría que cambiar el sistema. Si tuviera un techo tan grande que fuera una población habría que cambiar el sistema."

El testigo fué interrogado entonces por el abogado del demandado, así:

"A.—Con referencia a la teoría de $550 por cada tonelada que se trabaje un día a que se refiere eso, se refiere a la maquinaria, al mo

lino o a toda la Central con todas sus propiedades?—T.—A la factoría de una fábrica de azúcar. El edificio de la fábrica y la fábrica.—A.— Dónde están los molinos y artefactos propios para fabricar azúcar? T.—Sí, señor, molino, tanque de guarapo, tacho y el edificio necesario para cubrir las maquinarias todas.—A.—Usted sabe de casos de centrales en Puerto Rico que tengan edificios separados y estén exentas de contribución?—T.—No conozco ninguna.—A.—De modo que no se ha hecho una cosa especial de la South Porto Rico Sugar Company en relación con la manera de tasar?—T.—No, señor, no se ha hecho una cosa especial, se ha hecho con todo el mundo.—A.—Dónde hay un almacén de azúcar en otra central que se ha tasado lo mismo que la South Porto Rico Sugar Co.?—T.—Sí, señor.—A.—De acuerdo con el valor que ustedes han considerado justo y razonable?—T.— Sí, señor.''

Examinada aisladamente la teoría de la demandante parece lógica en verdad. Desde la oficina se dirige cierta parte de la fábrica, los almacenes son para depositar el producto de la fábrica y las piezas de repuesto listas están para sustituir las de la fábrica que fallen en su funcionamiento, y siendo ello así, todo es parte integrante del negocio.

Pero si dicha teoría se analiza a la luz del procedimiento seguido por el Tesorero para encontrar la cantidad de $550, pierde toda su fuerza porque a esa cantidad se llegó tomando en consideración únicamente la fábrica en sí misma, o sea ''molino, tanque de guarapo, tacho y edificio necesario para cubrir las maquinarias todas.''

El procedimiento consistió seguramente en la investigación del costo de diferentes centrales y de su capacidad efectiva llegándose entonces al promedio que representa la cantidad indicada. Y si a ese promedio se llegó sin tomar en consideración almacenes, oficinas y piezas de repuesto, no sería justo incluirlos en el caso de la demandante. Resultaría contrario al propio concepto de igualdad en la tasación que tan fuertemente invoca la demandante.

Ahora bien, si a la suma de $550 se llegó por el proceso indicado ¿cómo puede explicarse la diferencia de rebajar esa suma en unos casos y subirla en otros?

No está desprovista de fundamento la diferencia porque

en verdad si el valor de tasación es el que la propiedad tenga en el mercado, un molino potente vale como tal más que otro de escasa producción, irrespectivamente del valor separado de cada pieza de maquinaria o de cada metro cuadrado de construcción.

Pero si eso es así ¿a qué se debe? Si la central de la demandante puede llegar a una capacidad productiva tan extraordinaria que supere en un quince por ciento el *standard* fijado por el propio Tesorero, ¿no se debe a tener a mano piezas de repuesto que reducen al mínimo las interrupciones y almacenes que permiten guardar con seguridad la enorme producción diaria?

La diferencia del 60 al 125 por ciento en la cantidad tipo —$550—por la cual debe multiplicarse el número de toneladas de caña molida diariamente, para hallar el valor de la central, sólo podría justificarse por la diferencia en el proceso de inclusión como partes integrantes de la fábrica todos aquellos accesorios que hacen posible el resultado, tales como los almacenes y las piezas de repuesto.

Por eso dijimos al principio que ambas cuestiones estaban íntimamente relacionadas. No puede el Tesorero a nuestro juicio, sin incurrir en una injusticia notoria, aplicar una diferencia sin compensarla con la otra.

Analizada la prueba encontramos que el sistema de la diferencia del 60 al 125 por ciento en el múltiplo sólo se aplicó durante uno o dos años abandonándose después. Siendo ello así, nos parece que la resolución justa del problema es la de dejar subsistente la tasación separada de la oficina, los almacenes y las piezas de repuesto y revocar la que se obtuvo multiplicando por un 115 por ciento de $550 la capacidad diaria en toneladas de los molinos de la central. La multiplicación deberá hacerse por $550.

Según el cálculo hecho por la demandante la cantidad que debe devolvérsele por este concepto es la de $5,246.60. *La sentencia apelada se modificará a ese efecto y así modificada deberá confirmarse.*